We'll proceed with City of Fremont v. FERC. Counsel? Thank you. May it please the Court, I am Howard Gollop, and I represent the City of Fremont, California, one of two petitioners in this case. To my right is Ms. Frances Francis, who represents the Northern California Power Agency, the other petitioner in this case. We're sharing our time in this matter, and we divided the issues in the interest of efficiency. This is the mailroom error case, is that right? Am I remembering right? Is this the mailroom error case? Your Honor, that is the way it's been denominated, but I have reservations that that's what happened. But that is the same case. And we hope to reserve about eight minutes for rebuttal, of course, if we can. With the leave of the Court, I was going to address the issue of whether the Commission's orders violated Section 15c1 of the Federal Power Act. That's the section that establishes a, quote, statutory deadline. Ms. Francis will address two other issues, in both cases assuming arguendo that Section 15c1 does not prohibit the Commission's orders in this case. The two issues that she will address is whether the Commission's orders unlawfully waive the Commission's regulations, and she will also address the issue of whether the Commission's orders unlawfully conferred a so-called incumbent preference, which is created by Section 15a2 of the Act on PG&E. But my focus will be on Section 15c1. Our position on that is really quite straightforward. Section 15c1 created a deadline for filing applications for new licenses. It is undisputed that PG&E did not meet the deadline. There's no issue about that in this case. Or if so found, PG&E did not appeal that decision. The orders under review, however, purported to grant a waiver of Section 15c1. In our view, 15c1 is, as it is called in the statute, a statutory deadline. And in our view, the orders that are before you would destroy the statutory limits and would create a system which is entirely discretionary to FERC. It didn't purport to waive the deadline. That's right. In our view, the statute did not permit them to waive that deadline. Well, they didn't waive the deadline. They declared it an orphan proceeding. Excuse me. Sorry, I couldn't hear you. They didn't waive the deadline. They declared the proceeding to be an orphan proceeding. Yes, sir. And they had the effect, by doing that, of waiving the deadline, if I could explain. In 1989. Why? I had understood it the same way, that they applied the deadline and said, even though it was just an accident, you can't get out of it, it's now an orphan. I don't want to take the Court's time on it. We controvert the so-called accident nature, but let's just treat it as such for the moment. In 1989, when FERC was adopting regulations to enact this new or, excuse me, to implement this new statute, which had been passed in 1986, it looked at this precise issue. Its conclusion in its regulation, issued in order 513 in 1989, was the statute did not permit the incumbent to file after the statutory deadline. Now, I mean, to me, that's very basic. And I don't think that — Does it permit anyone else to file who didn't file by the statutory deadline? And that is — in 1989, they dealt with that question. They looked at it and they said, there's a gap here. Congress did not think of a certain scenario. And the scenario is where the licensee filed its five-year notice saying, we will file the application. But when it came to the statutory deadline, the two-year limit, they didn't do it. And FERC said, you know, Congress did not think of this scenario. And they called it a gap. And they said, we're going to create orphan regulations. And they said, our regulations will permit anyone other than the incumbent to come in in the orphan proceedings. But there was nothing in the statute that prohibited them from saying anyone including the incumbent can come. I beg to differ. In 1989, FERC looked at that question because in the rulemaking process, several parties challenged this precise issue. They said, no, you should not have the incumbent subject to such an extreme rule. And FERC responded in 1989 that the legislative history of the Act, which was then fairly current to them, did intend to prohibit that incumbent from filing after the expiration of that period. Counsel, that's a different question, though. I thought the question was, is there anything in the statute itself, not FERC's interpretation of the statute, but is there anything in the statute itself that addresses whether or not the incumbent can come. You were forced to interpret. And if every statute were absolutely clear, of course, the workload of this court would be easier. But the statute has that it says applications for new license, which could be read to mean all applications, shall be filed within the statutory deadline. I'm paraphrasing. All right. But then that would preclude new applications as well, because no one filed an application during the statutory time period. Is that correct? I think arguably it could have. And in 1989, FERC addressed it. We're not challenging what they did in 1989. In 1989, they drew a line. They said, you know, the incumbent is barred. Before we get to what FERC did, we all agree that the statute does not address it. Do you agree with that? I apologize. Do you agree that the statute does not address the situation? I think that absent the legislative history, we would be asking ourselves whether everyone is barred or only the incumbent is barred. And what language are you relying upon to invoke an uncertainty in the statutory provision? It's actually cited in the January order of the commission itself. They still maintain that interpretation of the statute. No, but I'm asking you what language. We only get to an interpretation of the statute if it's ambiguous. What language are you relying upon in the statute that brings an ambiguity in your mind in terms of whether or not the statute does not address the orphan situation? Well, I think Justice Canby was correct. The statute bars everyone after the two years. And the question was, could anybody be allowed to participate? And that would be the starting point. Then the next question was, okay, did Congress really mean to go that far? And that brings us to the next step of the analysis. Now, I'm sorry I referenced FERC. It's just that my reasoning happens to agree with FERC's in 1989. I just wanted to make sure that we all agree that the statute does not explicitly address the orphan application situation. That is correct. All right. And FERC, as I say, created regulations. It was upheld in Oconto I. And we have no particular dispute with Oconto I. It's not really on point to our case. The commission has attempted to take Oconto I and have the exception that they created in 1989 swallow the rule, because I will submit to this Court that under the commission's current position, there is no statutory deadline for anyone. So we started off with, was everyone barred? I don't get it. It seems like an overdrawn statement that you just made. My statement? Yes. I'll stand by it, Your Honor. I'd like to explain my reasoning. Well, let's see. Do we using the U.S. Code citations, where do we start here, 16 U.S. Code 808C? C-1, yes, sir. When I look at C-1, I can't say there's no deadline. It's at least 24 months before expiration. And that was not met, correct? If you go down about six lines. Hold on. Let's stick with me for the moment. That was not met, correct? Clearly not met. I believe it's undisputed it was not met. And then we go to C-2, correct? C-2 is not applicable to our case. Well, C-2 appears to be a delegation to the commission to provide, by rule of order, with respect to existing licensees who are unable to comply with a specific time period. Yes, sir. The commission did not rely on 15C-2. PG&E did not rely on 15C-2. And 15C-2 is inapplicable.     and if the commission had relied on 15C-2, then in that case some entities would have been caught in the transition. So this 15C-2 was designed to let the commission grant some waivers in that setting. I think 15C-2 is revealing, because it is not applicable to our case, and no one in this case has claimed that it is. I think it gives a negative inference. Where do we go next? Where do we go next? I see your point. Where do you go next? Okay. My next point is 15C-2 is inapplicable. The next point is back to 15C-1. You mean using the U.S. Code version 16 U.S.C. 808? 808C-1. If you would look to the section you were referencing a minute ago, Your Honor, go down about line 6 or so. It refers to the statutory deadline. That's not my characterization. That's the words. I have the statute. They call it, quote, statutory deadline. I would suggest that has some meaning. Well, counsel, once that's missed, then where do we go from there? In terms of the statute. Once that C-1 has not been complied with, then where do we look in the statute for the next step? Okay. In my view, you need to look, then, to the legislative history and FERC's own interpretation, which has been consistent. Wait a minute. Legislative history and FERC's own interpretation are two different things. I would think that the first place you'd look after that would be the regs. The regs are absolutely unequivocal. They draw this exact distinction that I'm drawing. After you look at the regs, what's the matter with the argument that's been made in this case that an agency has authority to suspend its regs in the interest of justice? It doesn't have authority to suspend a statute in the interest of justice. But where its own regs are simply designed to provide for expeditious and fair proceedings, is there something to the contrary of the authority that they can suspend their own regs in the interest of justice? Yes. Ms. Francis was going to address that issue, Your Honor, if I could defer it to her. My issue is just on the statute. Our view is the regs simply reflect the statute, and so FERC said in 1989. It wasn't those regs were not a discretionary decision. FERC said they are required by the statute. What words are you referring to? In order 513, which was the commission's rulemaking, they had promulgated tentative regulations, which were basically the same as what we have today. Several parties challenged that, asked for relief from the provision, which would have barred the incumbent. And they were making the kind of argument that Justice Canby was making, which is, well, you know, why should we be the only ones who run into the bar? FERC says back in Order 513 in 1989, as to the prohibition on untimely applications by existing licensees, that's the incumbent, the commission believes that the legislative history of ECBA, footnote, requires retention of this provision. So they're not saying they're in our discretion as an agency charged with enforcement. We think this is the right way to enforce it. They're saying we read the legislative history, and this is how we interpret the statute. Yes, sir. And that was a position I took in 1989, and in our brief we cited that they said that again in their hydro licensing handbook in 2001, and they said it again in a case involving Arizona Public Service. At the end of 2001, and then in our case, confronted by PG&E's so-called mailroom error, they decided to waive it. And here we are, Your Honor. That gets me back to my question. Why can't they? Well, in our view. Or an administrative agency charged with administering this. I think Ms. Francis should address that question. My proposition would be the statute doesn't permit it. Somebody else is doing that. Okay. Your Honor, you asked my lead-in question. The question is what happens after C-1 and the 60 days expires, and it's very clear PG&E missed its deadline. Asked it your client. I don't think that. My client was not applying, and I would like to address that issue. There was only one individual, one applicant for this PO project, Your Honor, and that was PG&E, who was the incumbent. But, counsel, the statute talks in terms of each application for a new license. It does not predicate that upon a current licensee. It just says each application for a new license must be filed. That's correct, Your Honor. And my client, NCPA, was not at that point an applicant, Your Honor. There was, as I said, it's just a question of fact. How many applications were there? There was one application. I would like to address the question, though, however, of what the point is. So your position is that anyone other than the incumbent can also miss the statutory deadline and be allowed to put in an application, but the incumbent cannot. That's your argument? Your Honor, that's not my argument. That's what the regulations provide, Your Honor. That's why I put these regulations up, because they are, in an arcane field, an incredibly very clear set of regulations. What it says is, in what we call the initial round, when the applicant, in this case, it happens to be an incumbent named PG&E, missed its deadline, someone asked the question, well, what happens then? Well, what happens is that round two starts. There is, in fact, a subsequent or round two of competition for the license. That's why we call it an orphan, because it doesn't have a parent anymore. The commission's regulations could not be more clear as to who gets to play in that second round and who does not get to play in that second round. What the regulations make very clear is that the incumbent, the existing licensee, who has, in fact, filed notice of intent to file an application and fails to do so, may not file an application for a new license. By the way, this ---- Is it your position, counsel, then, that the agency cannot change that regulation, cannot grant relief from that regulation in its discretion since it's a regulation that it promulgated? Your Honor, I think that the commission could, in fact, change the regulation if it took the proper steps under the APA and promulgated a change. And you really hit it right on the nail. The commission, in fact, decided it didn't like the result, so it indeed set upon itself to go change this regulation. This very clear regulation, there are two of them, which the commission waived. Now, what did the commission do? The commission took these regulations, which took three years, by the way, Your Honor, to promulgate under the APA. The entire industry participated in making these whole new set of relicensing regulations. What the commission did is, on October 1st, when PG&E failed to come in with its license application, the commission knew what it was supposed to do. It had these regulations to guide it. The commission did what it was supposed to do in the regulations. It started Round 2. The regulations were very clear as to what happens in Round 2. It said that Round 2 was to invite the world virtually to come in and compete for this license application. And unlike Round 1, which also had very elaborate rules and regulations and so forth, but included a preference or an incumbent preference, Round 2 was very different. Round 2 was not supposed to include the incumbent, clearly by these regulations. And number two, Round 2 was going to be a level playing field in which the world could come in and the commission would have the opportunity to pick the best license proposal. And here we come to basically the guts of the whole relicensing system. Congress had reformed the relicensing statute in 1986 because it was concerned that the commission simply was not generating enough competition among the applicants. And when it did so, it wasn't following timely procedures. The commission would allow an existing licensee to keep a license for 10, 15, 20 years on a year-by-year renewal basis. So the public was getting gored, to put it mildly, because these 50-year licenses were old-fashioned licenses. What the commission wanted to do and what Congress certainly wanted to do was to encourage more license applications, better license applications, and modern ones. But it couldn't seem to get the commission off its stuff to get going, set deadlines, and keep these proceedings moving. So what it did in the reformation of these regulations in 1986 is it came up with a set of regulations, as I said, that were pretty clear. If somebody misses the deadline, well, we have to go into the next round because that's what our job is, to follow the rules, keep this process moving. And what the commission did when it started to, it didn't just waive. I love this word. They didn't just waive the regulations. Because waiving regulations sounds like you're just sort of tweaking it here and there. This commission wholesale changed the regulations that govern the conduct of Round 2. First of all, it let in PG&E. Those regs say you can't be in. But it let them in. And once it let PG&E in, what did it say? It gets the incumbent preference. Well, it's true that Congress didn't address the question of the incumbent preference. But, you know, if you can't get in by the regulations, then why in the world would you talk about it? I couldn't see that the incumbent preference amounted to anything. All it said was you disregard matters that are insubstantial or something like that. Right. You're right, Your Honor. And you agree exactly with the D.C. Circuit in Camargo. And the commission cites the Camargo decision. And I have great respect for the D.C. Circuit, Your Honor. And they did read the statute right. It should amount to nothing or it should be very insubstantial. The Camargo decision, Your Honor, is a 1988 decision. These rules didn't come out until 1989, Your Honor. So what makes the incumbent preference such a competition killer, Your Honor, is the commission's actual conduct. Not once in its entire history has the FERC ever given a new license or a renewal license in a situation where the incumbent wanted the license. I know it and everyone else knows it. We hold that we don't have jurisdiction now and what we should do is just wait for the licensing proceeding to end and then when it comes back up, determine that whether PG&E should have been allowed to put in for it and whether the commission overweighed the so-called incumbent preference. Actually, it never mentions incumbent or preference. Who doesn't mention incumbent preference? The so-called incumbent preference provision. It just says that something along the lines of insubstantial differences can be disregarded. Right, Your Honor. And in our briefs we have outlined and given you copious evidence, Your Honor, that, as I said, there is not a single case in which anyone who competed with an incumbent ever won. And that's pretty good for everybody. I think Your Honor asked a question earlier as to the question of where were my clients in October 1? Why didn't they show up with a competing license application by the deadline? I didn't say why didn't they. I just wanted to ask whether or not they had the opportunity to file an application. Yes, they did, Your Honor, and they had the opportunity and they didn't take it And no one else did either because these applications are very expensive to pursue. PG&E says it spent $3 million to pursue an application, and I wouldn't recommend to a client that it spend $3 million for a zero chance of winning. And that's what anybody else in the world besides PG&E had with regard to this project on October 1, Your Honors. But you will note that in July of 2002, when the Commission, following its Round 2 proceeding, invited the public to come in and present new applications, that there were four applicants who filed a notice of intent, Your Honor. Those four applicants, the Commission says, are evidence and proof that their Round 2 was perfectly okay as a procedure. Your Honors, that could not be further from the truth. There were three other applicants there in Round 2 because for the first time we thought that there might be a chance. And the reason why we thought there was a chance was because the Commission's regulations in Round 2 gave us a level playing field. However, what the Commission did is by reconstructing the rules for Round 2, ignoring its own regulations, and note that it only did it in this one case. Only this one case have the rules been changed. Once the Commission reconstructed the rules for Round 2, we're back to these old rules. This is the rule that's good today. But it wasn't good enough when the Commission made the rules for this Round 2. I noticed that one of the judges had mentioned that his library was decorated with 18 CFRs, and it reminded me that, yes, we have all these regulations, but when they're actually called into play, then the Commission simply took upon itself to just ignore what was in 18 CFR, made up its own rules. And, you know, the Commission gave two reasons why it felt justified in changing, totally reconstructing the rules for Round 2. One of the reasons it said was that the crime doesn't fit the punishment. It's a marvelous statement. It has no relevance to this case. There was no crime and there was no punishment. PG&E messed up. It missed the deadline. But the regulations provided a remedy for that, and PG&E itself had agreed as a licensee to follow the regulations. So where was the crime and where was the punishment? Counsel. Thank you. May it please the Court, good afternoon. My name is Larry Gastiger. I represent the Federal Energy Regulatory Commission. And with me at the Council table is Mr. William Madden, representing the Pacific Gas and Electric Company. I've ceded five minutes of my time to him for any questions you might have. Let me start off right off the bat with one misstatement that Council made. The Commission has, in fact, waived this regulation in another instance, in a case called Domtar, Maine Corporation. And the site is 99 FERC, paragraph 61,276. Did you cite that in your brief? Actually, we did not, Your Honor. It is in the Petitioner's opening brief where they attempt to distinguish that case. There is also, in fact, another instance in this very case in which we waived a provision of 16.25 when we provided at Petitioner and CPA's request additional time for them to meet the deadline for filing their application in the orphan project proceeding. What was the waiver, the first waiver you referred to? What did that involve? What was waived? It was the bar on incumbents participating in the process. The facts in that case, I'm a little fuzzy on, but they were, in my view, a little bit less egregious than the situation here where all we had was a one-day late filing, mail-room error, as Judge Kleinfeld put it appropriately, that the Commission was. Quite frankly, I think this case was a situation where the Commission was trying to do equity in light of the circumstances. 15C1, as the Court has appropriately pointed out, does not apply only to incumbent licensees, as Petitioners keep characterizing it. The language is each applicant. And under the theory advanced by the Petitioners, that would lead to the logical conclusion that if no applicants met the deadline, then no applicants could participate in the orphan project proceeding. In this situation, had another application come in other than from PG&E and met the 24-month deadline, PG&E's application would have been rejected, and that other applicant would have been the only applicant for the license, and PG&E would have been out of the running for the license. Counsel, in the Dontar case that you just cited? Yes, ma'am. What page are you talking – are you referencing regarding the waiver? If you'll bear with me for just a second. All right. Apologize for the delay. Okay. The Commission orders that the – the Commission hereby waives those parts of 18 CFR section 1624A2 and 1625A that would otherwise bar Dontar from filing an application. Yes.  Are you referring to that that justified the waiver? All right. It says, unlike PG&E – this is on page 62,169 – unlike PG&E, where the licensee's failure to meet the filing deadline was due to human error, Dontar was aware that requests for rehearing of the December 23, 1997 order had been filed and apparently decided to gamble that the Commission would uphold that order rather than to protect itself by filing a relicensed application. So they just neglected to file the application? Because there were other proceedings going on that could have impacted their ability to do so. As the Commission characterized it, it was a gamble on their part. We didn't have anything like that here. This was a plain and simply a mistake. So in my view, the situation in Dontar was not as equity-based as it was here. The rule for when an agency can grant relief by not applying its regulation. Well, we cited the American Farm Lines case as applying the error, and I think as Judge Kleinfeld appropriately put it, the Commission has the authority to waive regulations when it's in the interest of justice to do so. I don't know. Was it that broad? I mean, it seems to me it's been interpreted. It has been interpreted that broad by other circuits, certainly. I think they had an exception in American Farm Lines where there is substantial prejudice to the complaining party, didn't they? Right. Well, there's a statement somewhere in either that case or the one construing it saying that when a rule is just a rule that's made for the convenience of the agency anyway, the agency can waive it. And what the Commission looked to here, that's right, and what the Commission looked to here, though, was the actual purpose behind the rule. In the rehearing order, the Commission cited to language in the preamble to the regulations indicating that it was intended to deal with situations in which the incumbent licensee had misled other potential applicants from filing, and the Commission said we don't have that situation here. There's nothing to indicate other than. What's the incentive to mislead? I'm not sure that it's entirely clear other than. Why don't you file an application? Other than to, well, other than to potentially seek to obtain more time in which to file your application. If you have three years in which to prepare the, two years in which to prepare the application and you're in a situation where you don't have enough time to do that, if you don't go ahead and file, it goes into the orphan project situation. It's something of a gamble, I would think, but it's no one else filed either. You go into the orphan project situation and you gain an extra 18 months in which to complete the application. It also may be a situation where they're actually looking to not have anybody apply for the license so that they can get rid of the project without anybody taking it over. Perhaps prejudice them in that way. I'm not sure. I don't know that the situation has actually come up all that often. I mean, what you're saying is that the rule, the purpose of the rule isn't served by applying it here, and I'm just trying to think if there are any instances where the purpose of the rule would be served by applying it. Well, if we had no circumstances like here where we had an indication that, in this instance, a male room error. Frankly, I don't think we're going to run into this situation very often, if ever again. I hope not. But probably not with PG&E anyway. It's just hard for me to imagine a license holder sitting back and saying, well, we're not going to apply when we're supposed to, which would frighten away every other applicant. We'll not apply, but we'll say we're going to apply, and that'll frighten away the applicants, and then we can apply late. And, well, of course, if we're wrong and we didn't frighten away all the applicants, we'd lose the license. It would be a bad gamble, certainly. So I just. And it's hard to see what advantage that PG&E was tempting to gain in this situation. Or any other license holder. Unless you look at this as just some sort of a very draconian provision to make people file on time. If that's the purpose of it, then it should be best served by enforcing it. I think what the commission was trying to do in this situation was to do equity in the situation that we were facing. We were aware that they had completed their application. The affidavit in the record indicates that they had expended extensive resources in order to do so. The situation was it just came in one day late due to a mailroom error. The commission couldn't do what they asked us to do, which was to revise the license in a way to make it fit within the statutory deadline, consistent with the other statutory provisions. But when it came into the orphan project realm, we were able to, in this situation, create a waiver to allow them to participate with others. We're allowing them to compete with the others. I think the petitioners have vastly overblown the significance of the incumbent preference. The D.C. Circuit, not only in the Camargo case, but also in Oconto Falls, has classified this as a marginal preference. Well, maybe a marginal preference, but it always works. It hasn't actually come up all that often, Your Honor. So we don't know how it would work in practical application. Many of these cases where there have been other competing applications, there have been settlements that have resolved it so that it has whittled down to only one. Maybe it doesn't come up very often because it's so very effective nobody will ever file it. Well, maybe that augers in favor of not reviewing the case at this point and waiting to see how it plays out. We did make a jurisdictional argument as to whether the court should review it. This would be an instance in which we could test those theories. Counsel, for whose benefit? Just one more question, then. For whose benefit would you say that those rules are written? I would say it's for actually the agency's benefit to preserve the integrity of the orphan project process by not allowing incumbents to mislead other applicants in order to later compete in the orphan project round. All right. Excuse me. Okay. Counsel, would you agree that from the time of the promulgation of these regulations in 1989 until the time that the waiver that we're discussing was granted, there had been no waiver prior to that time? I'm not aware of any case in which we have waived it. I'm not aware of any case in which it's been an issue, for that matter, where we've denied it either. Okay. Oh, I thought there were a couple of cases where the waivers were denied prior to that time. I'm not aware of them dealing with this specific provision. I thought PG&E 87 Ferg paragraph 61022 in 1999 did refuse to waive that, or not refuse to waive it, but adhere to the regulation requirements. Which case was that? It was PG&E 87 Ferg paragraph 61022. And I also thought there was a case in 1997, Skorupski 79 Ferg paragraph 61339, where the regulations were adhered to. I'm not familiar with those cases. If you accept that that's true, if you accept my representations on that, would that change your argument regarding whether or not the waiver in this case should be entitled to deference if prior to that time these regulations had been strictly adhered to? No. As the commission made clear, we're looking at this under the particular facts and circumstances of this case. I am not familiar with what the reasons were for the waiver in those instances. But here the commission was basically saying, as they put it, the punishment of precluding PG&E from competing for this license in the orphan project proceeding did not fit the crime of having their application come in one day late due to a mailroom error. Is that rationale undermined by the fact that subsequent to that, there were no reasons for the granting of the waiver in the Dunbar case? Is the rationale weakened by the fact that there were no extenuating circumstances in the subsequent case? I don't think it weakens them in this instance, Your Honor. I think that the circumstances here speak for themselves. I don't know that ñ and I'm not aware of anyone challenging the waiver in the Dunbar case for having the commission give it further opportunity to explain the basis for it there. Did you say at the beginning of argument you wanted to save time for the third party? I did. And if there are no further questions, I can cede the remainder of my time to the intervener. Thank you, counsel. Please. Ladies and court, my name is William Madden, and I'm here on behalf of Pacific Gas and Electric Company. A couple of preliminary matters. The Dunbar case involved a circumstance which also was not envisioned by the commission at the time of the 1989 regulations. Domtar gave notice that they were going to compete as the existing licensee. Then the director of FERC announced that they didn't need a license. The project was licensed incorrectly the first time, and they were out of there. The problem was that ñ and they didn't file. And the problem was the case went on appeal, and the commission changed its mind, and now it's in the court of appeals. They didn't file when they thought they had a green light, and now they're in trouble. And FERC decided, no, no, that deserves a waiver, similar to the waiver they gave to PG&E, a situation in which was not envisioned in 1989. In 1989, the commission thought only in terms of an applicant of an existing licensee that gave notice but did not file, period. Now, you ask, why would somebody ever do that? There are some reasons in the real world, and I've met up with those kind of reasons. You have a project which is not a marginally ñ which is marginally economic, and you want to get rid of it. You want to sell it. You want to cut a deal. But you realize that if I don't give my notice, someone else may compete for it. So you give the notice. You try to work out a deal, and you fail at the last minute. You have no application to file. You've misled somebody because you had no intention of putting together an application at all. There could be other circumstances I could reveal or speculate on, but I don't think they would serve any purpose here. The critical thing that the commission enunciated in 1989 when it adopted these regulations was that it would preclude the existing licensee which gave notice and didn't file because that would constitute a misleading act on the part of the existing licensee. That was the purpose. That was the reason why the existing licensee was to be excluded, because it would have misled others. Come forward to 2002 when it issued its decision in this case and granted the waiver, they noted that very precise purpose in the 1989 Order 513. The purpose was, in effect, to punish an existing licensee who misleads. After three years and $3 million in preparing a license application and suffering this mailroom error, we didn't try to mislead anybody. We just goofed up. Those things happen. And they happened in a number of cases that have been cited in these briefs in other contexts. But in virtually every one of them, FERC denied a waiver, even though they could have granted a waiver, because there was someone else in the door who had spent the money, prepared the application, and would have been substantially prejudiced. And this brings us to American Farm Lines. Every agency has the inherent authority to waive procedural regulations if the ends of justice so require, and there is no substantial prejudice. And we submit in this case that it's a matter that in American Farm Lines they have this language, the rules were not intended primarily to confer important procedural benefits upon individuals in the face of otherwise unfettered discretion. And then they say, thus, there is no reason to exempt the case from the general principles that a rule can always be relaxed. I think that is significant, Your Honor, because the court in American Farm Lines and the dissent looked, and of course they disagreed, on the purpose of the regulation of the ICC in that case. The purpose of the regulation here was identified by FERC, the primary purpose, and identified by FERC not only in 1989, but also in our order, was to punish an applicant that did not file, an applicant that misled. That was not PG&E. We didn't sit around figuring out a way to mislead anybody, and we didn't sit around figuring out a way to be one day late in the service of our application. The regulation in 1989, the purpose of it was not designed to punish this kind of an existing licensee. And I think FERC complied with American Farm Lines by looking at what was the primary purpose. What the court was doing in that language that Judge Kleinfeld quoted was differentiating, distinguishing vitrioli against seton in that line of cases where the Supreme Court has said, well, an agency must adhere to its own regulations, and that was the case of an employee who was being discharged without a hearing or any kind of process. Correct. The idea was, well, the process was to protect the employee. Correct. Exactly. There was someone who would have been substantially prejudiced, like in the Dulles case. And you're saying there's no prejudice here because to the extent that those regulations are intended to benefit anybody other than the agency, it's the whole world. That is correct. Yes. But let us take the situation that I'm sure the Congress and the commission was envisioning in the 86 and 89 period, where another applicant came in, a stranger, and filed on time. That would be. We're dead. We wouldn't be here today if that had happened. That's the kind of substantial prejudice I would have a problem with. We don't have that here. FERC had that kind of a problem in other cases where there were competing applicants in the door and they said, no, we're not going to grant a waiver for a mailroom error. We're not going to grant a waiver for a misunderstanding the time period because there's going to be substantial prejudice against someone who has already done their homework. There's no prejudice here because they were. They had not. For the mistake, they wouldn't appear. That is correct. We're a wounded duck. They're hovering. They're looking to move in for the kill. I don't blame them. But that's not what this process is all about. Is there any issue that arises in these type of proceedings? I don't know anything about them really. Of a straw man, like an incumbent that expects to have a straw man file an application instead of itself because of some problem it has. Then the straw man lets the incumbent down so the incumbent files late. The concern about the straw man was a situation where an incumbent licensee with a lousy record, lousy compliance record. That's the kind of thing I'm thinking of. Let someone else be the straw man and go forward working behind the scenes in cahoots with them. And FERC said we're going to scrutinize these applications very carefully. Actually, thinking with liquor licenses, that sort of thing happens all the time. Well, they didn't mention liquor license problems, but they did recognize that problem. Same basic kind of administrative law structure, actually. Yes. FERC made sure its regulations were there to preclude that from happening. But that's not our situation, and I don't believe either of us have gotten into that. Is that the kind of situation that they mean to exclude the incumbent from coming in late on? No, I think that would be a situation where the commission would find that the straw man is fronting for the incumbent with a lousy compliance record. And a guy that knows that he shows up may be denied a license. And having set up a straw man or entered into some kind of joint application arrangement, they weren't going to be fooled by it. And they've made that clear in other regulations. But I don't think that's our case. Thank you, counsel. Thank you. And I confess we lost track of our time. But you overran it by a considerable amount. And if you want to take just one minute for rebuttal, go ahead, but limit yourself to that. Dom Tarr is at page 27 of Fremont's initial brief. We cited it because it stands in our mind. It followed our case. It did not precede our case. We believe it's a floodgate problem. The statute created a deadline. The regulations permitted orphan exceptions. But now what's happening is the commission is completely eliminating the statutory element. There is no situation remaining under the first interpretation where the statute limits the filing. It all becomes discretionary. And in Dom Tarr, I think it was two years. It all becomes discretionary. That would take the phrasing of the statute and render that phrase a nullity. Now, it's true it could be read too broadly, I concede. But it must be given some meaning. And the meaning it was given back in 1989, and I think it was the correct meaning, is it was really aimed at the incumbent. And that's why the regulations were done in our brief pages six through seven. We cite where FERC has said it's statutory at origin, not discretionary. Thank you. Thank you, counsel. Counsel, do you wish to take another 30 seconds? Yes, Your Honor, may I? I think, Your Honor, there is a whole traditional line of cases in which the ‑‑ if the regulation is clear, Your Honor, the agency is honor bound to follow it. Mr. Madden is very persuasive. Is there any prejudice? Yes, there is, Your Honor. There is extreme prejudice. And that is the point I wanted to raise. The commission says there is no prejudice. I assure you, if the one‑day rule, not this rule, but if the one‑day rule prevails that the commission invented for this case, there is extreme prejudice. There is not likely to be any winner other than PG&E. What's the prejudice? The prejudice is that PG&E might get a renewal? Is that the prejudice? The prejudice is that PG&E will have a favored priority position. There is a tilt in the rules, Your Honor, in the second round that has not been found anywhere in the regulations. That's the difference. There is extreme prejudice. Our briefs try to explain it. We think the facts are obvious. There has not been a single case in which a challenged incumbent has ever lost a license. Thank you, Your Honor. Thank you, counsel. The city of Fremont is submitted, and we are adjourned until 9 a.m. tomorrow.
judges: Canby, Kleinfeld, Rawlinson